Nicholson, C. J.,
delivered the opinion of the Court.
Plaintiff is the widow of Andrew Phadenhauer, who committed suicide in Nashville in 1868. She sues the defendant for one thousand dollars, the amount for which his life was insured by defendant. The contract of insurance contains a clause by which the policy is void, if the assured “ shall die by suicide, or by his own hands.” Upon the trial in the Circuit Court of Davidson county the plaintiff' introduced proof to show that the assured was insane at the time of his suicide, for the purpose of avoiding the above recited clause in the contract. Under the charge of the Circuit Judge the jury found a verdict for the defendant. The plaintiff has appealed.
The error relied on for a reversal is assigned upon the charge of the Circuit Judge. After instructing the jury correctly as to the legal definition of suicide, the Judge said: “You will therefore look to the proof, and see whether the deceased was insane at all; if so, whether he was insane at the time of killing himself; and if so, whether he was so insane at the time of the act as not to have capacity to discern right from wrong; for to constitute suicide, it is not sufficient that he had mind enough to know that means employed to destroy life would produce the result; he must have had mind enough to know that in a re *571 ligions and moral point of view it was wrong. If he had not that much mind at the time of committing the act, he was incapable of committing suicide, and the contract will not be void by reason of the proviso.” After thus instructing the jury in regard to insanity as applicable to a case of suicide, he next proceeds to discuss the meaning of the words, “ die by his own hands,” used in the contract. He tells the jury that these were not used in the contract as synonymous with “ suicide,” but were intended to cover some case that would not amount to technical suicide. He says: “ It was intended ■ to extend to all cases where the party had mind enough, and sufficient knowledge of physical laws to know that the means he employed would produce death, and were employed with that intent, though the obliquity of his mind might be such as not to understand that it was a crime.”
After giving ample illustrations of his meaning, he concludes: “I am of opinion, therefore, that the terms ‘siiicide or by his own hands’ embrace all cases of voluntary self-destruction where the party does the act voluntarily with the intent to kill himself, and has intelligence enough at the time to know that the means employed will produce that result, whatever may be the moral condition of his mind as to its perception of right and wrong; further than that, I think neither of the terms, nor both of them, together extend.” “ On the other hand,” he continues, “ if the party is so insane that he knows not what he is about, or if his imagination is haunted by frightful spectres, so that *572 he jumps out of a high window to escape them and is killed, etc., and a thousand other cases that might be supposed where the death is the work of his own hands, but at the same time an involuntary act into which he has been madly drawn by the frenzy of the moment, not knowing or understanding the danger on which he is rushing, and neither willing nor intending to produce the result; in none of these cases would he be guilty of suicide, or death by his own hands, within the meaning of the contract.” If we comprehend this charge, the Judge intended to instruct the jury, first, that if the deceased had mind enough to know that the means employed would produce death, but did not have mind enough to know that his act was morally wrong, he was not guilty of suicide, and therefore the contract of insurance was not void for suicide. Second, that if the deceased had mind enough to know that the means he employed would produce death, and these means were employed with that intent, but through obliquity of mind he did not understand that his act would be criminal, this would be the taking of his life “by his own hands,” within the meaning of the contract, and therefore in that case the contract would be void. And, third, that if the deceased was so insane as not to know what he was about, but was driven madly and involuntarily to the taking of his own life, without intending it, he would not be guilty of suicide, or of taking his life with his own hands, in the sense of the words as used in the contract, and therefore in that case the contract of insurance would not be void.
*573 The first duty that devolves upon us is to ascertain the true meaning and intention of the parties to the contract of insurance; and in doing this, it -will be necessary to determine whether the Circuit Judge’s construction thereof is correct. By the terms of the contract, the defendant, for a specific consideration to be paid semi-annually by the deceased, agreed to pay to him $1,000 on the 25th of May, 1881, or within sixty days after due notice and proof of his death, should he die previously. But upon this, among other conditions, “that if the person aforesaid shall die by suicide, . or by his own hand, or in consequence of an attempt to commit suicide, or to take his own life,” etc., the policy shall cease and be void.
The obvious intention of the defendant was to provide against liability if the assured should voluntarily destroy his own life; and it was the intention of the assured to create no claim on the defendant if he should destroy his own life. To effectuate this intention, the language used was: “If he shall die by suicide or by his own hand.”
The parties had in their minds the single idea of voluntary self-destruction, and to express it they first used the word “suicide;” and by way of explanation, they add “or by his own hand,” meaning by the latter words to define more specifically what they meant by “ suicide,” and meaning by both expressions the voluntary self-destruction of the assured. That the two expressions — die by suicide, and die by his own hands — are synonymous in their meaning, has been determined in numerous cases. In Hartman v. Keystone *574 Insurance Company, 21 Penn. R.., 466, Judge Black held that the words “die by his own hands,” standing alone mean any kind of suicide.” In Dean v. American Mutual Life Insurance Company, 4 Allen, 96, the Supreme Court of Massachusetts defined the same words to mean “the destruction of life by the voluntary and intended act of the party assured.”
In Breasted v. The Farmer’s Loan and Trust Co., 4 Hill, 74, Judge Nelson adjudged that “suicide” and “ die by his own hand,” as generally used in policies, were synonymous, and that “die by his own hands” means voluntary self-destruction by the free will of a sane man. Upon reason and authority, therefore, we conclude that the two expressions, “ die by suicide” and “by his own hands,” were used by the parties as synonymous, and intended to convey the distinct idea of self-destruction. We are therefore of opinion that while the charge of the Circuit Judge may have given to the jury the literal meaning of the words used by the parties, yet, in laying down the distinction between dying by suicide and by his own hand, he may have misled the jury, and made an impression on them not intended.
The proof makes a clear case of suicide or voluntary self-destruction of life. The deceased was found dead in his stable, hanging by a rope to a post. That he took his own life, and that he did it voluntarily, was not contradicted.
The only question in issue was, whether he was sane or insane at the time of committing the suicide? If insane, the question .of law was presented, whether *575 the contract of insurance was thereby made void?
The English rule on this question seems to be fully stated in the case of Borrodaile v. Hunter, 44 Eng., Com. Law, 336, in which Justice Erskine said :
“ Looking simply at that branch of the proviso, upon which the issue was raised, it seems to me that the only qualification that a liberal interpretation of the words with reference to the nature of the contract requires, is that the act of self-destruction should be the voluntary and willful act of the man, having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his own 'death by the act; and that the question whether at the time he was capable of understanding and appreciating the moral nature and quality of his purpose is not relevant to the inquiry, further than it might help to illustrate the extent of his capacity to understand the act itself.”
The English doctrine recognizes the general principle laid down in 4 Black. Com., 189; 1 Hale Pl. C. 411, that “ self slaughter by an insane man or a lunatic, is not an act of suicide within the meaning of the law;” but it confines insanity or lunacy to a defect of the powers of the mind and reason to understand the physical nature and consequences of the act, ignoring the incapacity of the mind or reason to understand the moral nature and consequences of the act.
It is difficult to reconcile this position with sound reason. If a man may not be a suicide because he lacks sufficient mind to understand the physi *576 cal nature of his act, we do not see why he may not be denied to be a suicide because he lacks sufficient mind to understand the moral nature of his act. The American authorities are conflicting on this question, but we think the decided preponderance is on the side of those which hold that if a man has not mind enough to understand the moral nature of the act of self-destruction — in other words, if he is incapable of distinguishing between right and wrong — he can not be a suicide.
To constitute an act suicidal, it must not only be voluntary, but it must be the act of one capable of distinguishing right from wrong. It cannot be controverted that there is such a thing as moral insanity, as well as mental insanity. When a clear case of moral insanity is made out, it ought to be as conclusive in excusing the party from crime as when a clear ease of mental insanity is made out.
This is the view of the question adopted in most of the American authorities, and we have adopted it in a criminal case, at the present term, as most consistent with sound reason and humanity.
As suicide is a crime of the highest grade we see no reason why the rule should not be applied to that crime. There is danger that this rule may be abused, but this fact only increases the responsibility which rests upon the courts and juries to .confine the doctrine only to cases where the moral insanity is satisfactorily established by clear proof. The law raises no presumption of insanity from the act of self-destruction. When proof is made showing that the deceased died *577 by suicide, it follows by the terms of the contract that the defendant was not liable.
It then devolves on the plaintiff to prove the insanity of the deceased at the time of the suicide, in order to relieve the act of self-destruction from the consequences of avoiding the contract. In the case of Terry v. Life Insurance Company, tried in the United States Circuit Court for Kansas, at the May Term, 1871, Justice Miller and Judge Dillon presiding, Justice Miller in his charge to the jury said: “It is not every kind or degree of insanity which will so far excuse the party taking his own life, as to make the company insuring liable. To do this, the act of self-destruction must have been the consequence of insanity, and the mind of the deceased must have been so far deranged as to have made him incapable of using a rational judgment in regard to the act which he was committing.
If he was impelled to the act by an insane impulse which the reason that was left him did not enable him to resist; or if his reasoning powers were so far overthrown by his mental condition that he could not exercise his reasoning faculties on the act he was about to do, the company is liable. On the other hand, there is no presumption of law, prima facie or otherwise, that the self-destruction arises from insanity; but if you believe from the evidence that the deceased, although excited or angry, or distressed in mind, formed the determination to take his own life, because in the exercise of his reasoning faculties he preferred death to life, then the company is not *578 liable, because be died by bis own hand within the meaning of the policy.”*
This charge was made by Justice Miller, after a review of all the authorities, and we think it may be regarded as a succinct and comprehensive, but correct, exposition of the law of the ease. Without attempting the impracticable task of laying down the distinction between mental and moral insanity, or stating how far they are necessarily commingled, he leaves the jury to determine from the proof whether at the time of taking his life the deceased was capable of forming a rational judgment in regard to the act he was committing.
For the error indicated in the charge of the Circuit Judge, the judgment is reversed, and the cause remanded.

This decision was affirmed by the Supreme Court of the United States in 15 Wallace, 580.